1 WOOLF & NACHIMSON LLP
Chaim J. Woolf (State Bar No. 236957)
2 15300 Ventura Blvd., Suite 214
Tel: (310) 474-8776
3 Fax: (310) 919-3037
E-Mail: chaim.woolf@wgclawyers.com
4
Attorneys for Plaintiff,
5 REACTX

6                    UNITED STATES DISTRICT COURT

7                    CENTRAL DISTRICT OF CALIFORNIA

8                         WESTERN DISVISION

9

10

11  REACTX , a Limited Liability       **CASE NO.:  2:17-CV-07913 RGK
    Company                            (AFMX)**

12                Plaintiffs,          *ASSIGNEND TO HON. R. GARY
                                       KLAUSNER*
13           v.

14  JONATHAN MENDEZ, an individual;    **PLAINTIFF'S FIRST AMENDED
    YIELDBOT, INC., a Delaware         COMPLAINT FOR:**
15  corporation; and DOES 1-50, inclusive,
                                       **(1) FRAUD;
16                Defendants.          (2) NEGLIGENT
                                       MISREPRESENTATIONS;
17                                     (3) BREACH OF CONTRACT;
                                       (4)MISAPPROPRIATION OF
18                                     TRADE SECRETS**

19                                     **DEMAND FOR JURY TRIAL,
                                       ATTORNEY'S FEES, COSTS,
20                                     INJUCTIVE RELIEF, AND
                                       PUNITIVE DAMAGES**

21

22

23

24

25      Plaintiff **REACTX, A Limited Liability Company** ("REACTX"), as and

26  for its First Amended Complaint ("FAC") against Defendant **YIELDBOT, INC.**

27  ("YIELDBOT") and Does 1 through 50, collectively "Defendants," alleges as

28  follows:

WOOLF
&
NACHIMSON, LLP
ATTORNEYS AT LAW
LOS ANGELES

                                    1

# I.

## PRELIMINARY STATEMENT

1.      In this case, REACTX seeks compensatory and punitive damages, royalty fees, injunctive relief, attorneys' fees and costs against YIELDBOT based, among other things, on YIELDBOT'S misrepresentations, breach of contract, and misappropriation of trade secrets towards REACTX.

# II.

## THE PARTIES

2.      Plaintiff REACTX is a California limited liability company which has its principal place of business in Los Angeles County, California

3.      Plaintiff is informed and believes an on that basis alleges that Defendant YIELDBOT is a Delaware Corporation with one of its principal place of business originally located at 3015 Main Street, Suite 460, Santa Monica, CA 90405 and presently at 1426 Main Street, Suite C, Venice, CA 90291 where all matters relevant hereto took place.

4.      Plaintiff is unaware of the true names and capacities of the defendants sued herein as DOES 1 through 50, inclusive. As such, Plaintiff sues these Defendants via fictitious names. Plaintiff is informed and believes and on that basis alleges that these yet unknown Defendants have had some actionable involvement in the acts and occurrences alleged herein, and share some responsibility for the harms suffered and relief sought by Plaintiff. Plaintiff will see to amend its pleading if at such time when it ascertains the identities of any parties so named.

5.      Plaintiff is informed and believes and on that basis alleges that each and every one one of the Defendants herein, including without limitation DOES 1 through 50, inclusive, is the principal or agent, or has otherwise acted in concert with or under the direction or control of, each of the other defendants. Plaintiff is further informed and believes and on that basis alleges that each and every one of

the defendants herein, including without limitation DOES 1 through 50 , inclusive, is the alter ego of the other Defendants, such that adherence to the fiction of the separate existence of any of them would work unjustly to deprive Plaintiff of the full rights and remedies he otherwise would have had against each of the other Defendants. Therefore, the acts of each and every one of the Defendants, including without limitation DOES 1 through 50, inclusive, constitute the acts of each and every other Defendant, making each liable jointly, severally or otherwise, for all damages and other harm caused to Plaintiff as alleged herein. Accordingly, reference to any one Defendant shall be deemed also to include each and every other Defendant, including without limitation DOES 1 through 20, inclusive.

### III.

### JURISDICTION AND VENUE

6.     This Court has jurisdiction under 28 U.S.C. Section 1332 because there is diversity of citizenship between the parties and the amount in controversy is greater than $75,000.00.

7.     Venue is proper under 28 U.S.C Section 1391 because the events giving rise to this FAC happened in this district.

### IV.

### FACTS COMMON TO ALL CAUSES OF ACTION

8.     CHIP MEYERS ("MEYERS") and Jonathan Mendez ("Mendez") have been close friends for over 35 years since their youth. So close that both men started college together, been part of each other's wedding parties, attended family functions, and vacationed together.

9.     MEYERS and Mendez have additionally both been involved in Digital

PLAINTIFF'S FIRST AMENDED COMPLAINT

WOOLF & NACHIMSON, LLP ATTORNEYS AT LAW

1   Ad Tech for many years.

2   10.   In or around May 2009, MEYERS founded ParkedSkins (a precursor

3   to Skinected, LLC and REACTX), a company that developed a creative platform

4   that scaled non-standard advertising units. The company provides a platform to

5   create, manage, and deploy custom adaptive rich media creative with video that

6   requires highly specialized advanced methods and capabilities In or around the

7   October 2010, ParkedSkins became Skinected, LLC.

8   11.   In or around November 2010, Mendez founded YIELDBOT a

9   technology based company that predicts the type of advertising to present based

10  upon keyword searches. Mendez additionally served as YIELDBOT's CEO until

11  late 2017.

12  12.   Prior to the incorporation of Skinected and YIELDBOT, while

13  MEYERS and Mendez were both working on their respective platform

14  technologies, MEYERS and Mendez discussed working together or, at the least,

15  having MEYERS incorporate his digital creative platform technology into

16  Mendez's prediction technology.

17  13.   At the time he  started his business ParkedSkins,  Meyers offered to

18  provide digital marketing assistance to Mendez's newly formed consulting

19  business, Ramp Digital. Conversely, on January 25, 2010, Mendez, in what he

20  termed a "bargain of a lifetime," offered to act as consultant to Meyers for High

WOOLF
&
NACHIMSON, LLP
ATTORNEYS AT LAW
LOS ANGELES

PLAINTIFF'S FIRST AMENDED COMPLAINT

Impact Media, LLC (the successor to Skinected and precursor to REACTX) in exchange for options.

14.     In 2010, after forming YIELDBOT, Mendez introduced Meyers to YIELDBOT'S co-founder Rich Shea.

15.     In December 2014, after years of Mendez asking why he was not on MEYERS'advisory board while others who did less were, and based upon MEYERS and Mendez's relationship, MEYERS on behalf of Skinected, appointed Mendez as an independent advisor to Skinected.

16.     The above appointment was effected by an amendment to High Impact Media, LLC's (the successor to Skinected and precursor to REACTX) Operating Agreement, which listed Mendez as an advisor and provided him with a Two Percent Ownership interest in High Impact Media, LLC.

17.     A sample of MENDEZ's advisory activities includes:

- In or around March 13, 2015, during an email exchange between MENDEZ and MEYERS, MENDEZ, in his role as Advisor, advised MEYERS to sell REACTX after Meyers told him, "'Hi my little advisor, according to Quantcast, we are in the top 15 of reach globally and the 65th biggest US reach'.

- In or around April 7, 2015, MENDEZ performed advisory role type duties by reviewing a REACTX sales deck to show potential

purchasers and, additionally, advised on modifications to the deck to which Meyers thanked MENDEZ in an email by stating, 'Thanks to my REACTX Advisor, you are correct this subject header is labeled properly." As an official Advisor, Mendez proudly showed his admiration for what REACTX was doing and how it was trailblazing in the ad tech industry. As an example, in an email dated December 3, 2015, Mendez wrote to Seth Demsey of AOL, "I am an advisor to REACTX and they mentioned to me the other day that they were talking to you guys. Obviously I am biased but think they have built some great tech that is highly undervalued in the market right now. Chip and Stefan have been doing this stuff for years."

18.    Reciprocally, Meyers continued to help Mendez with his company YIELDBOT and was responsible for securing its Los Angeles area office at 3015 Main Street in Santa Monica in April of 2015, which was located next to REACTX.

19.    In or around January 2014, Skinected formally changed its name to REACTX, a name that MEYERS believed better represented the company and sounded more marketable.

20.    On November 24, 2015, after Monica Higgins, REACTX VP of Strategic Sales, sent to both Mendez and Joel Hall, YIELDBOT'S VP of Product, a file of REACTX's full marketing materials in PowerPoint so YIELDBOT could

utilize it in their own marketing as a YIELDBOT direct offering. Mendez replied that YIELDBOT was "sending notes out to all our publishers on Monday to get their approval to run this" and that its "sales team is out selling it already."

21.    Parallel to the above, by late 2015, evidence of the close relationship between Mendez and MEYERS and the desire to work together was actualized with YIELDBOT utilizing REACTX'S digital creative platform for its own sales. By way of example:

- On January 5, 2016, after a call between Joel Hall and Stefan Kosel ("Kosel"), co-founder and expert in technology of REACTX, Meyers asked Mendez and Hall, "Stefan [Kosel] did mention to me that you wanted to utilize our tech for one mobile expandable managed format, is that the primary use for doing high impact at this time?" Wherein Mendez replied, "It is Chip. Crawl, walk run," and Hall responded, "In the short term we are looking to leverage the convenience and pre-built templates of ReactX."

- On January 19, 2016, after Meyers sent Mendez an email stating 'here is our latest high impact cross device overview to keep in mind as you expand your offerings on what can be done via the platform", to which Mendez replied "Nice Deck!"

- On February 3, 2016, Meyers introduced Mendez to a potential client for YIELDBOT'S shopper monetization.

22.     In February 2016, based upon the above and to further their relationship, REACTX agreed to allow to YIELDBOT access to its digital creative platform for its own use.

23.     However, based upon the fact that REACTX had invested years of research and development and over $4.5 million dollars creating a digital creative platform that also included a video player, REACTX deemed all information that it was required to share in full with YIELDBOT a trade secret.

24.     Based upon the above, prior to allowing YIELDBOT'S employees access to its access tools, REACTX maintained a Terms of Use agreement through pop up agreement that required YIELDBOT'S employees to check a box to agree to non-disclosure, confidentiality, and agree that REACTX'S source codes were proprietary in nature and subject to protection.

25.     On or around February 11, 2016, prior to using REACTX'S proprietary digital creative platform, YIELDBOT'S employees; specifically, its Vice Presidents Liane Pierce, Evan Rutchick, and Joel Hall, agreed to REACTX'S Terms of Use, which included an NDA, Confidentiality, and Non-Compete clause. A true and correct copy of REACTX'S pop up Terms of Use agreement, which YEILDBOT'S employees agreed to is attached hereto as Exhibit A.

26.     Parallel to the above, in February 2016, through a series of emails, MEYERS on behalf of REACTX asked Mendez, in his advisory role, for advise on how REACTX can get acquired by outside companies.

27.     Although YIELDBOT at the time was actively selling REACTX

technology, in or around February 22 and March 1, 2016, in response to MEYERS'

emails regarding advice on selling REACTX, Mendez advised MEYERS that

REACTX is not ready for sale.

28.     Based upon Mendez's advice, MEYERS decided not push for outside

buyers to acquire REACTX and continue to work heavily with YIELDBOT.

29.     Throughout the year 2016, based upon Mendez's representations that

REACTX should not be sold and its present intertwined relationship with

YIELDBOT, REACTX allowed Kosel, who as mentioned above was REACTX's

co-founder and technology lead, to consistently provide support to YIELDBOT to

assist in its sales of REACTX technology through its platform.

30.     Examples of YIELDBOT's use of Kosel include a March 18, 2016,

email where Teron Samuel of YIELDBOT asks Kosel to "add this additional logic

to the Unit? We plan on running this on both publishers with adhesions and inline

units'." YIELDBOT executives such as Mendez and co-founder, Shea, were fully

aware of Kosel's work for the company as they were regularly cc'd on such emails.

31.     On April 26, 2016, after YIELDBOT repeatedly taking advantage of

REACTX and Meyers' goodwill in assisting YIELDBOT in its endeavors through

technical support and use of its employees, Meyers informed Mendez "We will do

this one last thing for you. But if YIELDBOT wants anything additional after this

or if you want a shopper specific unit that you/Dan mentioned, then moving

forward we need to get paid which in turn means I pay our devs to do stuff for YIELDBOT specifically in the manner you want utilizing our tools/tech."

32.    On April 27, 2016, YIELDBOT launched its final free campaign using REACTX, which was praised by Mendez in an email, "Great to see this ad running!, ReactX is the Best!"

33.    Throughout the month of May 2016, the parties began discussions of how, when the free campaign ended, REACTX would need to be compensated for its platform and support. Examples of the discussions include:

- On May 19, 2016, Meyers reminding Joel Hall in an email to "Keep in mind that we usually get $0.50 cpm from our other clients but for this first campaign we waived this fee. Please do make sure that for any future campaigns ReactX is allocated this $0.50 cpm fee".

- On May 31st Meyers wrote in an email to Hall and Mendez,  "so the understanding from Liane Pierce was this initial first campaign would run through May I believe. Can you please confirm then that we can get our fee starting tomorrow June 1st for all activity moving forward?' and "as discussed we need to bill our managed flat fee moving forward as of June 1st for any activity."

34.    On May 31, 2016, realizing his free run with REACTX was coming to

an end, Mendez responded to Meyers that he "will investigate and come up with a plan. We do have some new formats we are considering and we would love to explore Stefan's help."

35.     On June 22, 2016,  Mendez, on behalf of YIELDBOT, began providing Kosel and Meyers, REACTX's founders, with the outline of his idea of compensating REACTX by writing, "Dear High Impact Men, We would like to have a call today to go over some ideas we have to get further adoption of your tech through YIELDBOT. I am in the best position to get you and give you (since everyone else will try and rip you off) 1+1=3. I can put Stefan [Kosel] on our payroll and buy you some time with us and with this model. I have the sales team that can sell in this product immediately to every top pub we have relationships with. I think we could sign 20 deals at $10k per month before EOY. That's $2M+ ARR and you magically become worth $10-20M in 6 months." In addition Mendez stated, 'We can make an investment but it's probably better to just buy you."

36.     On June 23, 2016, while making promises of purchasing REACTX in the multi-million dollar range, Mendez knew that for the time-being to continue using REACTX some action was required and stated, "Right now I want a license agreement for YIELDBOT to use the tech."

37.     Although Mendez promised that the license agreement would be only a short term 1 year license at 10k per month plus fees after 50 million impressions plus 60k upfront for additional custom work done for YIELDBOT on the existing

platform, on July 12th, 2016, Hall sends to Meyers a proposed license agreement to utilize the REACTX tech and platform on an exclusive basis for the long term.

38.     Frustrated by what was now being presented, Meyers responded that "1. This is a non-exclusive license so this should be changed in paragraphs 2.1.  2. There are to be no changes of code nor use of the license good unless we do it. This video player and platform is owned by us and patentable only by us and there to be no modifications unless we do it. So paragraph 2.3 should be stricken. 3. This 5 year term is new to me and after this we can only go 3 years at this point under the current terms of 10k per month."

39.     Hall agreed to make REACTX'S changes and in or around July 14, 2016, REACTX and YIELDBOT entered into a joint licensing agreement for REACTX'S digital creative platform. The terms of the parties agreement was for three years, with a 90 day walk-out provision that could only be exercised after the first year. In addition, the agreement provided a discounted payment from REACTX'S typical terms and conditions YIELDBOT was already under of $250.00 per 1 million ad impressions after 50 million impressions occurred in a month, which was  payable on a month by month basis.

40.     On July 18, 2016, shortly after entering the into the limited licensing agreement, MENDEZ again brought up the idea of purchase and asked Meyers, "I want to put an option for us to buy the player you build for us at the end of a year, how much?"

41.     Between July and August 16, 2016, based upon YIELDBOT'S again serious propositions to buy REACTX,  Mendez, on behalf of YIELDBOT, and Meyers discussed that they both agreed that they believed that REACTX appeared to be worth around $7.5 Million dollars: highlights of the parties emails regarding valuation include:

- Mendez stating, "The math is pretty straight forward. SAAS valuations are 5-10x of annual revenue rate. If u have $2M in ARR that's $10-$20M valuation and with video I would think you would be on the high side."

- Meyers response that 'My goal is to sell for $7.5 mil plus get upside. Assuming we get just 11 clients signed then these numbers work you think?'

- Mendez response that "I think the numbers work. I also think that my sales team could blow this out Q1of next year"

- Mendez followed up again on pricing with  "We might be able to do something like pay $500k cash, let you guys keep all the RTB revenue going for 1.5 years(and additional 750K) and then give you a royalty on any licensing arrangements we are able to sell. But that's going to be a multi-year payout in order to you $5-10M."

42.     On September 30, 2016, interested in the how REACTX was

WOOLF
&
NACHIMSON, LLP
ATTORNEYS AT LAW
LOS ANGELES

PLAINTIFF'S FIRST AMENDED COMPLAINT

performing and excited at Mendez's and YIELDBOT'S continued interest in

purchasing REACTX, Meyers sent an email to YIELDBOT'S engineering and

product team, which included Mendez, to confirm "that all live campaigns or

campaigns in the process of being put live are working as intended'. In response,

YIELDBOT'S Hall, confirmed, 'Yes, they are live and working as expected'.

43.     On October 1st, 2016, during a telephone discussion where Mendez

informed MEYERS about YIELDBOT'S firing of many of its key executives for

offenses that included sexual harassment, drug and alcohol abuse, and child

pornography and how YIELDBOT'S About US website page was constantly

changing, MEYERS and Mendez agreed that November 1, 2016 would be the

target date to formalize the acquisition that they had begun discussing back in 2015

about  creating a closer relationship between the companies through a buyout of

REACTX.

44.     One question that remained in the discussions of the purchase was

whether YIELDBOT would acquire all of REACTX, including its programmatic

offering. Regarding this issue, in an October 7, 2016 email thread to Mendez, Shea,

and Kosel, MEYERS stated, "I know Mr. Mendez is adamant about not being

interested in any programmatic offering."

45.     During the month of October 2016,  REACTX and YIELDBOT

engaged in the following activities to show the seriousness of the impending

purchase:

- On Thursday October 13 and Friday October 14, 2016, at the ReactX offices directly next to the Yieldbot offices at 3015 Main Street in Santa Monica, MEYERS hosted the following YIELBOT Senior Engineering leadership California; Richard Shea, Glen Larson, Andrei McMillan, and Bala Nair. During these two days both MEYERS and Kosel spent approximately 12 hours going through all of REACTX's proprietary documentation, code, platform features, business models, client functionality and other trade secrets that had never been shared with any other external company to date with the above YIELDBOT employees. MEYERS also graciously bought the YIELDBOT team dinner and drinks. During this on site extensive diligence exercise, requested and required by YIELDBOT in order to complete the acquisition of REACTX, the YIELDBOT team also interviewed other REACTX employees in order to prepare proper offers of employment for future work at YIELDBOT following acquisition.

- On October 18, 2016, Meyers provided YIELDBOT, through Mendez, with a password protected zip file containing all due diligence documentation requested by YIELDBOT.

Woolf
&
Nachimson, llP
Attorneys At Law
Los Angeles

PLAINTIFF'S FIRST AMENDED COMPLAINT

- On October 27, 2016, REACTX and YIELDBOT, through Meyers and Mendez, introduced each other to their respective M&A attorneys, Scott Alderton and Adam Dinnow.

- On October 31, 2016, Mendez, on behalf of YIELDBOT, sent an email to Meyers stating 'Here is where I am at with our proposal for all assets related to REACTX creative suite and brining on REACTX team members. $2.04 million cash payable as $120k 1st month then $80k/month for 24 months. Additional $2 million payment once we reach $30 million revenue related to technology acquired in our purchase (estimated to be 18-24 months). If we include the Appnexus app[1] I am open to making the upside scenario larger $4 million on $40 million in revenue. It's critical for YIELDBOT that we nail this down by Thursday in order to proceed."

46.     On November 2, 2016, after YIELDBOT'S employees completed their due diligence at the on-site meeting on Friday October 14th, on target with their earlier discussions, and based upon YIELDBOT'S satisfaction with REACTX'S technology, MEYERS and Mendez on behalf of their respective companies continued in a more formal manner how YIELDBOT would acquire REACTX

---

[1] The "Appnexus app", which even according to the Mendez is worth $4 million dollars, is an additional asset to REACTX's programmatic advertising offerings.

PLAINTIFF'S FIRST AMENDED COMPLAINT

WOOLF
&
NACHIMSON, LLP
ATTORNEYS AT LAW

through an asset purchase agreement. The above meeting took place at YIELDBOT'S offices where Mendez threatened MEYERS by stating if they did not do the deal quickly, that we was going to build their own digital creative platform internally.

47.    Throughout the second half of November 2016, MENDEZ wrote to MEYERS that in order for any purchase to take place, YIELDBOT must take possession of REACTX'S technology, including its documents and blue-prints, on a shared drive so that YIELDBOT could have full access to REACTX'S technology.

48.    In response to Mendez prodding and in belief that YIELDBOT was serious about its purchase of REACTX, Meyers directed REACTX to move its technology over to YIELDBOT'S shared drives.

49.    On November 28, 2016, based upon YIELDBOT'S apparent satisfaction with REACTX's creative digital platform, and the fact that REACTX'S information was now stored on YIELDBOT'S shared drives, YIELDBOT, through its attorney, Adam Dinnow, presented a formal purchase offer agreement to REACTX attorney, Scott  Alderton, for $2,000,000.00 to purchase its creative digital platform.[2]

---

[2] The purchase price did not include REACTX's , programmatic advertising platform as YIELDBOT confirmed that it was not interested in the app programmatic marketplace.

50.     However, suspiciously, almost as soon as the offer made, on November 29, 2016, the following day, YIELDBOT moved away from implementing the offer based upon Mendez's representations to MEYERS that presently YIELDBOT could not afford the offer but was trying to continue to find the cash to make it happen.

51.     In early 2017, to further keep YIELDBOT in control of REACTX'S business and keep REACTX'S hope alive that the parties would continue to work together, YIELDBOT, through MENDEZ, made an offer of employment to REACTX'S co-founder Kosel. The terms of the employment agreement provided that the employment relationship would last two years, and Kosel would be entitled to $200,000.00 in year one and $250,000.00 in year two.

52.     In or around February 8, 2017, Kosel and Mendez acknowledged through emails that Kosel would be able to continue to assist REACTX and, based upon the existing relationship between REACTX and YIELDBOT, the above-assistance would not be in breach of Kosel's employment agreement with YIELDBOT.

53.     Mendez, MEYERS, and Kosel agreed that Kosel's role at YIELDBOT included using REACTX's digital creative platform to assist YIELDBOT's in-house creative department in creating high impact build outs for support for existing clients and for sales to new clients. These high impact buildouts included REACTX'S Outstream video format, a non-standard format that REACTX had

WOOLF
&
NACHIMSON, LLP
ATTORNEYS AT LAW
LOS ANGELES

pioneered. Prior to its engagement with REACTX, YIELDBOT had no technological abilities or capabilities of creating high impact advertising.

54.    In or around the same time as the above, Mendez additionally agreed to have MEYERS, himself, consult for YIELDBOT for $125,000.00 annually plus remit to REACTX a fee of $50,000.00 for hiring Kosel, all of which was never paid. MEYER'S role, according to YIELDBOT'S agreement, was to assist in the ongoing use of REACTX'S technology by YIELDBOT to build, service, and support YIELDBOT'S own technology related to mobile video and rich media technology.

55.    At all times, REACTX was under the impression that YIELDBOT and Mendez were adhering to their respective responsibilities under REACTX'S NDA, non-disclosure, and confidentiality agreements.

56.    However, on February 13, 2017, on his  first day of employment, YIELDBOT invited Kosel to a meeting entitled "Retire REACTX Kickoff". The agenda for the meeting was to "build/support a video management platform (similar to REACTX) to host internally at YIELDBOT in order to replicate REACTX present successes." Although not in attendance, Mendez was aware of and had sanctioned the meeting.

57.    It was now clear to Kosel that his hiring was merely a means through which YIELDBOT could now complete the puzzle to quickly and easily implement all the trade secrets and proprietary documents handed over from REACTX during

PLAINTIFF'S FIRST AMENDED COMPLAINT

WOOLF & NACHIMSON, LLP
ATTORNEYS AT LAW

the past years to figure out how deploy custom, nonstandard, flex and adaptive ad creative which includes video, which would ultimately allow YIELDBOT to acquiring REACTX'S digital creative platform at no cost except for a limited license term.

58.     On February 24, 2017, Kosel mustered the courage to confront Mendez through email regarding YIELDBOT'S intentions to replicate and kill the REACTX product. In his email, Kosel laid out why YIELDBOT'S actions were wrong and needed to change in order for Kosel to continue working at the YIELDBOT. Specifically, Kosel made the following statements:

- "Your team has internally spent the last couple of months in meetings, conversations and documents titled 'design out REACTX', 'Retiring REACTX' and through internal groups talking about 'Replication of REACTX' and stating that REACTX would not make it through the current licensing agreement."

- "You are on our Advisory Board and you have a fiduciary duty in a company that we both own equity in to not allow this premeditated and unscrupulous theft to continue. We have been talking to you about our tech since 2010. Further your company has been under a license agreement since July 2016 and just this past late November both parties agreement to move forward a purchase by YIELDBOT for a specific market segment of our tech/platform for $2 million.  Even though you

backed out the deal late last year and claimed it was due to financial

hardship, we recently agreed for you me to come work at your company.

But I did not take the job at YIELDBOT to rip off my own product and

am tasked to participate in with others."

- "Bottom line is that YIELDBOT is now building their own video/creative

   platform and tech based on years and millions of dollars' worth of

   REACTX's research and copyrighted intellectual property."

- "I will absolutely NOT participate in the CLEAR and DELIBERATE

   THEFT of our tech and IP by YIELDBOT, so do the right thing not only

   morally but legally and put an end to this company wide egregiously

   indefensible behavior."

59.    On February 24 and again on February 25, 2017, in response to

Kosel's email, Mendez admitted in writing that REACTX is "an amazing and very

robust platform for high impact mediate through RTB." In his same response,

Mendez attempts to diffuse the situation by explaining that YIELDBOT'S video

player will be different than REACTX'S because it will not be working on a

programmatic advertising platform.

60.    In late February 2017, through email and text exchanges between

MEYERS and Mendez regarding YIELDBOT'S actions of inducing MEYERS and

REACTX to work with YIELDBOT, provide YIELDBOT with its trade-secret

material, host REACTX material on YIELDBOT'S shared drives, create an

WOOLF
&
NACHIMSON, LLP
ATTORNEYS AT LAW
LOS ANGELES

PLAINTIFF'S FIRST AMENDED COMPLAINT

appearance that YIELDBOT was interested in purchasing REACTX to gain further access to material and be able to hire REACTX'S co-founder, and then use the above to replicate and kill REACTX to create YIELDBOT'S own digital creative platform, MENDEZ contradicted his earlier statements that REACTX was a great product and instead told Meyers that REACTX was lousy. Specifically, Mendez made the following comments:

- "I got approval to buy the REACTX creative tech from the board for $2M even though all we need is a single player and we could have built the player ourselves at a much, much lower cost. There was one reason I did this and it had nothing to do with your technology. Because I thought that if our situations were reversed, you would do the same for me."

- "Sad part is at the end you are going to realize you and Stephan [Kosel] have a distorted view of the value of REACTX and there is nothing worth stealing let alone buying and I was truly only trying to help you out in every possible way I could. In hindsight I should have just been a d dick and ignored all your requests to work together. If I hadn't given a shit about you and your business id be better off now and so would our friendship."

- Additional comments sent by Mendez during the weekend period of February 25 and 26 to Meyers and Kosel include, but are not limited to:

PLAINTIFF'S FIRST AMENDED COMPLAINT

WOOLF
&
NACHIMSON, LLP
ATTORNEYS AT LAW
LOS ANGELES

- -I have been going out of my way to help you and Chip for over a year now with paid work and planning to continue that into the future

- -There is clearly a large misunderstanding

- -Worth noting that I wanted to make the license longer when we originally drafted it but was turned down

- -No one that I know has actually done more to help REACTX in the last 2 years than me and that includes arranging for you to join us

- -I hope you can understand and appreciate what we're doing and building has nothing to do with REACTX and everything to do with our business and our desire to have you be a part of it.

- -I get that you guys are upset that we didn't buy REACTX and maybe nobody else will. I really get that. I can put myself in your shoes

- -Everything I have been doing with REACTX has been an attempt to help you and your company in every way possible

- -You pushed me hard to work with you guys and so I did because of one reason-I wanted to be helpful

- -Yes we have work entitled 'Replace REACTX'

- -I've had nothing but a helping and caring heart about you through all this. I'm probably the only person you ever worked with that can say that.

61.    On March 2, 2017, and contrary to the Mendez's assurances that

Kosel's continued assistance of REACTX would not be deemed a breach, YIELDBOT, nevertheless, terminated KOSEL for his refusal to kill REACTX.

62.     Regardless of whether Mendez was lying to Kosel by stating that REACTX was amazing product or lying to Meyers that Mendez only convinced the board at YIELDBOT to purchase REACTX because he wanted to keep his friendship with Meyers, in June 2017, YIELDBOT, through Mendez provided notice to REACTX that it would not renew its license agreement for year two and three.

63.     At the same time, beginning in June 2017 and continuing through today, YIELDBOT began to advertise its own digital creative platform that is now competing with REACTX, and which on its face appears to be, as YIELDBOT stated it would create, a replication of REACTX's digital creative platform.

## V.

## CAUSES OF ACTION

### AS AND FOR THE FIRST CAUSE OF ACTION

### Fraud

### (Against YIELDBOT and Does 1-50)

64.     REACTX reincorporates the allegations of paragraphs 1 through 63 inclusive and reasserts them as if though fully set forth below.

65.     Mendez as CEO of YIELDBOT, made numerous promises and representations to REACTX regarding its interest to work with REACTX for either the long term licensing or purchase of REACTX.

66.     These representations, as discussed above, included, informing REACTX to not seek outside buyers, to sell its product through REACTX, that it was in the best interest of REACTX to place its information on YIELDBOT'S shared drives, to present offers of purchase to REACTX, to enter into three year licensing agreements and to seek to work with REACTX'S co-founder and assert that there was no conflict of interest to work for both companies.

67.     The above-representations by YIELDBOT were false;

68.     YIELDBOT and Mendez knew that the representation was false when Mendez made the above-statements and/or made these representations recklessly and without regard for its truth; in that YIELDBOT through Mendez created the above illusion of interest in REACTX to learn about how the product worked so it could eventually replicate and then kill REACTX to create a product with no competition;

69.     When Mendez made these statements in his capacity as CEO of YIELDBOT he intended that REACTX rely on the above-representations to induce REACTX to provide all of its confidential information, manpower, and energies related to its digital creative platform to YIELDBOT;

70.     REACTX reasonably relied on Mendez's representations on behalf of YIELDBOT based upon the idea that YIELDBOT intended to create a long lasting relationship either through a licensing agreement and/or eventual purchase;

71.     REACTX was harmed by relying on the above-representations

PLAINTIFF'S FIRST AMENDED COMPLAINT

WOOLF & NACHIMSON, LLP
ATTORNEYS AT LAW
LOS ANGELES

because Mendez's statements in his capacity as CEO of YIELDBOT created a

situation where REACTX missed out on acquisitions by other companies because

of the its being forced to market only its Appnexus app as a stand-alone feature

because the remainder of the platform was under license by YIELDBOT based

upon Mendez's false representations that YIELDBOT was not interested in the

additional programmatic opportunities, has now had all of its trade secrets stolen,

lost a co-founder, and now faces a competing product whose purpose is to replicate

and kill REACTX.

72.     YIELDBOT acted with malice, oppression and/or in conscious

disregard for the legal rights of REACTX by fraudulently promising REACTX

future business in order to steal its trade secrets, employees, and then replicate and

kill REACTX. YIELDBOT's actions also constitute a blatant violation of

California common and statutory law. Punitive damages are therefore warranted to

deter YIELDBOT from further engaging in similar wrongful and egregious

conduct.

**AS AND FOR THE SECOND CAUSE OF ACTION**

**Negligent Misrepresentation**

**(Against YIELDBOT and Does 1-50)**

73.     REACTX reincorporates the allegations of paragraphs 1 through 72

inclusive and reasserts them as though fully set forth below.

74.     YIELDBOT, through the actions of its CEO Mendez, negligently and

recklessly made the foregoing misrepresentations to REACTX.

75.     As described above, REACTX justifiably and reasonably relied on

these misrepresentations.

76.    REACTX has been damaged by YIELDBOT's misrepresentations.

**AS AND FOR THE THIRD CAUSE OF ACTION**

**Breach of Contract**

**(Against YIELDBOT)**

77.    REACTX reincorporates the allegations of paragraphs 1 through 76 inclusive and reasserts them as if though fully set forth below.

78.    In or about February 11, 2016, YIELDBOT, through its Vice Presidents, entered into and agreed to REACTX'S Terms of Use Agreement, a copy of which is attached hereto as Exhibit A ("Ex. A").

79.    The Terms of Use Agreement contained specific terms regarding the scope of the license granted, the ownership rights, confidentiality, and survival rights of the Agreement. (See, Ex A, p. 31, Section 1; p. 32, Sections 4 and 5; and Section 9, p. 34). The above-terms specifically prohibited YIELDBOT from using REACTX's information to create a product which is substantially similar.

80.    REACTX did all, or substantially all, of the significant things that the contract required it to do by providing its proprietary information and schematics to YIELDBOT.

81.    YIELDBOT failed to keep by the terms of Terms of Use Agreement required it to do and in fact used the confidential proprietary information and schematics that it was prohibited from using outside the exact terms of the licensing agreement between the parties.

82.    REACTX is now harmed by YIELDBOT'S use of REACTX'S confidential proprietary information and schematics by YIELDBOT'S creation of a competing product based upon REACTX'S own proprietary information and schematics.

## AS AND FOR THE FOURTH CAUSE OF ACTION

### Misappropriation of Trade Secrets

### (Against YIELDBOT and Does 1-50)

83.    REACTX reincorporates the allegations of paragraphs 1 through 82 inclusive and reassert them as if though fully set forth below.

84.    REACTX owned and licensed proprietary information and schematics for its own digital creative platform which included a proprietary video player apparatus for programmatic advertising.

85.    The proprietary information and schematics related to its digital creative platform, which included a proprietary video player apparatus was a trade secret at the time of YIELDBOT'S misappropriation, in that REACTX worked many years and spent over $4.5 million dollars to create the digital creative platform, and kept its proprietary information and schematics to create the digital creative platform confidential by only providing information relating to its use under a strict Terms of Use agreement or between parties who were bound to a duty of confidentiality.

86.    YIELDBOT improperly and maliciously acquired and used the REACTX digital creative platform.

87.     REACTX was harmed and YIELDBOT was unjustly enriched by

stealing and now using the REACTX digital creative platform by deception.

**VI.**

**DEMAND FOR A JURY TRIAL**

88.     REACTX hereby demands trial by jury for its claims under the

common law and as allowed by statute.

**VII.**

**PRAYER FOR RELIEF**

WHEREFORE, YIELDBOT requests the following relief:

**On The First Cause of Action:**

a.     Compensation for all economic losses and financial injury, including
without limitation incidental and consequential damages proximately
caused by the wrongdoing of Defendants, in an amount believed to be
in excess of $6,000,000;

b.     Punitive and exemplary damages in an amount not less than 3 times
Plaintiff's actual damages, for total punitive damages now believed to
be not less than $18,000,000;

**On The Second Cause of Action:**

a.  Compensation for all economic losses and financial injury, including
without limitation incidental and consequential damages proximately
caused by the wrongdoing of Defendants, in an amount believed to be in
excess of $6,000,000;

**On The Third Cause of Action:**

a.  Compensatory damages for breach of the Agreements in an amount
believed to be in excess of $6,000,000; and

PLAINTIFF'S FIRST AMENDED COMPLAINT

WOOLF
&
NACHIMSON, LLP
ATTORNEYS AT LAW

b.  Attorney's fees.

**On The Fourth Cause of Action:**

a.  Recovery for all damages causes by YIELDBOT'S misappropriation YIELDBOT; and

b.  Recovery of any unjust enrichment gained by YIELDBOT, which when combining the above a and b is in an amount believed to be in excess of $6,000,000.00; or in the alternative;

c.  A reasonable royalty fees;

d.  An injunction enjoining Defendants from continuing to exploit Plaintiff's trade-secrets;

e.  Exemplary damages in amount not exceeding twice any award for willful and malicious misappropriation; and

f.  Attorney's fees.

**On All Claims:**

a.  Costs and expenses

b.  Prejudgment interest;

c.  Such other further and different relief, at law or equity, as the Court may deem appropriate.

Dated: January 11, 2018                    WOOLF & NACHIMSON, LLP


                                           By:  /s/ Chaim J. Woolf_____
                                                Chaim J. Woolf
                                                Attorneys for Plaintiff,
                                                REACTX

WOOLF
&
NACHIMSON, LLP
ATTORNEYS AT LAW
LOS ANGELES

PLAINTIFF'S FIRST AMENDED COMPLAINT